Good morning, Your Honors. May I please the Court? Gretchen Nelson on behalf of Lenhoff Enterprises, the plaintiff in the underlying case, and the appellant before the Court. I would like to reserve four minutes of my time for rebuttal. The case that we have today is a case that addresses the question of the plaintiff claims injuries and damages as well as injunctive relief for antitrust violations, first under the Sherman Act, Sherman 1, also under California's Cartwright Act, California's unfair competition law, and two common law claims for intentional interference. I think it is fair to say that courts around the country have struggled since the issuance of the over the question of what meets the standard of plausibility as it was articulated in those cases. This Court has grappled with it on a number of occasions, notably in the Starr v. Baca case, coming to the conclusion that where there are factual allegations that are plausible on both sides, the plaintiff and the defendant, and essentially create a situation where there isn't exactly a complaint problem. I agree with you that Twombly and Iqbal can create problems about how much specificity is needed, but my understanding here is the main problem is that how much inference of the plaintiff's claim is there in the case of Sherman Act section 1, section 2? Section 1. And whether this was in a complaint or whether this was all the evidence you had in summary judgment, we would be in the same place, right? And then you are unlikely to get any more evidence, are you? Well, I think it is fair to say that if the Court reverses, we would be back in the District Court and discovery would occur. And thereafter, a fully... And you could ask who met with whom and maybe you'd come up with an agreement. That's correct. And that will lead to... But it's a total fishing expedition. No, I don't think... That's the way the District Court thought. Well, I'm not... I'm not saying that Judge O'Connell used that phrase. It's just that she didn't think that you had alleged enough in terms of sort of the who, what, when and where. I think that's correct. That is precisely what the Court ultimately came to a conclusion. And you've got names and you've got where, but it's just the vaguest of allegations. It's just these folks were here, something happened that we don't like later on, and therefore they must have conspired. Yes. I disagree. And let me say why. In this case, there is no question but that there were factual allegations distinct from conclusions. And the Court in Twombly, the Court in Starr all make the point that what you do is you can eliminate the conclusions, but you need to look at the facts. And from those facts, you need to decide. Well, why don't you tell us what facts would lead us to? And also, it seems important to focus discreetly on the different sets of purported agreements, right? In other words, the price fixing and the 16 billion and whatever. If I can, Your Honor, actually let me take that and then I will turn to Judge Bobby, your question. One thing that we do know throughout all of the cases, not only from this Court, but from the U.S. Supreme Court, and the U.S. Supreme Court cases were tell-labs and otherwise, you treat the complaint in its entirety. This was not a claim where the plaintiffs were alleging there was a discreet little conspiracy there. That was the argument that the defendants attempted, and I think successfully did in the District Court, make the point so that you were essentially looking at little buckets as distinct from one entire conspiracy in its whole form. This was a claim. You have this 16G issue, let's say, the whole expiration of that agreement. Would you have a case at all? I'm sorry, if that's all we have? No, if you didn't have that. Isn't that the foundation? That is the foundation. All right. And so, as I understood it, the Screen Actors Guild was the group behind this 16G coming to its end. Am I right on that? That was the argument accepted by the District Court, but I think that fails to give credence to the allegations in the complaint, which made clear that a group, a committee of the ATA, which is the Talent Association's organization, had decided, collectively amongst themselves, and these are the defendants and two other non-named defendants, to eliminate 16G. Tell me how 16G hooks up with the ultimate… I mean, 16G was itself an agreement, right? So either keeping it or leaving it is an agreement. Correct. But it was an agreement between the Screen Actors Guild and the talent agencies. Right. And so then the question is, how does the 16G elimination hook up with what you say ultimately happened, i.e., that these four entities became so predominant and, in particular, changed the whole financial system of scheme? I understand that it meant that money was flowing from the talent agencies to the studios. Is that right? The talent agencies could invest in the studios. It actually was a little more… Both ways. It's essentially Rule 16G imposed limits on what talent agents could take financially from entities that had a relationship with the ultimate product. For want of a better explanation, it kept the movie industry from investing. It is the reason they were able to set up this alternate scheme where they would get a part of the profits. Absolutely. Well, I completely missed that, and maybe I don't read well, but I thought it had more to do with investments, not with this actual financing scheme. No, it actually was the core of it. And to return to Judge Gleeson, your question, what is alleged in the complaint and in facts, which were that the committee of the ATA made it clear that what they were going to do was to drive the demise of 16G. But they were only half of the agreement, and so there's no allegation, as I read it, that the committee somehow infiltrated or was part and parcel of the other half of the agreement, the Screen Actors Guild, as I understand it. That's not part of this. So how can there be a… Very simply, in order to enter into negotiations over 16G, the talent agency had to give notice to the Screen Actors Guild that they were imposing a request that they now negotiate. There has always… But 16G was about the talent agency couldn't have a financial interest in the production or distribution company. This 103310 or whatever it's called scheme wasn't about a financial interest in the production or distribution company, was it? No, but what is critical to this is the financial interests that flowed into the talent agencies, those that we claim are the defendants and the two others, as a result of the demise of 16G. 16G ultimately was voted down by SAG, but it was voted down by SAG… But your representation to me before, which I said I didn't understand, was wrong. I did understand. It doesn't have anything… So I still don't understand the connection between 16G and what ultimately… your ultimate complaint. And I'm sorry if I'm being thick, but it will be helpful. No, you're not. I understand. Let me see if I can articulate this much clearer. What was the prohibition on in 16G? Investments in talent agencies by entities that were producing the product. I thought it was the other way around. No. Okay. All right, so now the production companies can invest in talent agencies. How does that lead to the change in the compensation scheme and so on? What it did was allowed for the extraordinary growth of the defendants and the other two entities in a manner that was unparalleled. And after having that infusion of money, you can then engage in the balance of the activities that you are intending to do, which is to concentrate the market on packaging of scripted television series, as opposed to what the talent agencies were doing before, which was providing essentially a service industry at a 10% commission. As a result of the infusion of money, you now have the ability… the defendants, as we've alleged it, had the ability to grow exponentially, to be able to hire much more, to essentially be able to develop what we say to be a conspiracy to ultimately eliminate smaller talent agencies so that they can concentrate on the 3310 packaging. To go back to Judge Gleeson, your question, ultimately SAG voted this down, but it came about after negotiations and after there was a deal in place, which is the deal that SAG voted down. The deal that they had in place, that SAG voted down, was a deal that essentially allowed the camel in anyway because it allowed for the investment of money. That deal was never in place as I understand it. That's because SAG voted it down. But no matter how you look at it, had SAG not voted it down, the talent agencies had gotten a lot of what they wanted. And if SAG voted it down, the net result was 16G was going to die because the ATA then did not need to negotiate further and it would die of its own terms. So no matter how you looked at it, the talent agencies, the defendants, that we are asserting a claim against, were sitting in the driver's seat. But where's the conspiracy? So the conspiracy derives itself from, as we've alleged, the idea that what you have is a conspiracy to basically make these four agencies the sole- It sounds like a business model. Well, it could be- What makes it a conspiracy? They could either get SAG to agree to give them what they wanted or 16G was going to die of its own terms. That's not a conspiracy. I mean, if the rule is going to die of its own terms and the members of the ATA think that that will give them the opportunity to leverage a different deal with the studios, that's a business plan. Where's the conspiracy? That, Your Honor, is where you need to look at the entirety of this whole package of allegations in the complaint. It is not simply 16G. That was the start of it. That allowed the money to flow. Then next, the packaging of these scripted television products began to be overwhelmingly the business model, if you will, but in our view, a conspiracy. And the evidence- To step down and talk to each other and say, now we're going to get into packaging? I think that's probably something that we obviously would have the right to look into, but I think it's fair if you look at the numbers that that is precisely what occurred. But you don't have- Do you have any evidence that would suggest they talked to each other and arranged for this, the kinds of things that would demonstrate a conspiracy as opposed to independent actions by a couple of very large companies? We have, Your Honor, alleged in the complaint, all of the activity that was occurring with respect to the committee of the ATA as it related to Rule 16G. Imagine how many times you actually have them sitting down together and doing something. We have them sitting down and doing something in the late 1990s through to early 2000. What we also have is in 2014, the four agencies sitting down publicly pronouncing that they are going to set the price at which everything will be charged. So you- Where is that? That is, Your Honor, in the excerpts of record at- In the complaint? It's in the complaint, correct, 49, and it is paragraph 47 on page 15. Is that related to scripted TV series or something else? It is related to scripted TV. What occurred in the lower court is the defendant argued that had to do with Netflix, but it had to do, no doubt, with the scripted television series. The district court below made a comment that it was either in jest or it was unrelated. But at the end of the day, what that statement related to was the decision by these four individuals to say publicly, at least one of them, speaking for all, that we are going to drive, we will come up with a system of mathematics in which the four of us will judge what everything is worth, and it related to the issue of the 10. And so if I can get back to this packaging fee that they charge, which is 3,310, 3% at the beginning, 3% at the end, and 10% on the back end. And what we have here is evidence that- Just a minute, just to clarify. Sure. That was in place well before October 2014? The 3,310, yes, absolutely. Go ahead. And it is alleged in the complaint that that is what all four of these agencies charge for every scripted television series. There are facts- Now, you in your brief make a pretty separate argument with regard to that evidence being creating an inference of an agreement about that precise scheme, and your opponents say that that wasn't argued before, which sort of surprised me. But they, as I understand it, say that the price, the horizontal price-fixing was not argued before. I understand they said horizontal price-fixing wasn't argued before. I disagree with it, and certainly the district court below disagreed with it. In her order- The heading that says- In her order at docket 65, page 8, she starts out with a discussion of the fact that plaintiffs are alleging a horizontal price-fixing scheme. So I don't know. Their argument is we never argued it before. We did argue it. It was an allegation in the complaint. The argument in terms of that, the 3,310, I think it is important to recognize the significance of these four agencies charging that. And we've discussed this at length in the opening brief, how that figure, number one, was a sea change, a dramatic sea change, in terms of how they were billing before. Before, it was a 10 percent commission based upon what a client earned, and it then turned into an amount that the agencies would say to the potential clients and clients, we're not charging you any commission. We're going to get it all from the studio. So under the text messaging case, where you have a dramatic difference in the change in the manner in which you are charging, courts have held that can be evidence of a conspiracy. So that's number one. It's been consistent. I mean, that's your other evidence. It's been consistent. Nobody has tried to cut it or- No one has ever endeavored to break it. In fact, we have facts in the complaint that are alleged that where talent has argued that that deal should be changed because it is impacting their ability to properly produce a series, and this is the Meredith Steam instance that is alleged in the complaint, the studio refused to do anything because they were afraid, if they did so, that the agency would somehow or other do something harmful to them. Yes, but that's a different problem. That's not horizontal. In any event, your time is up. So why don't we give you a couple minutes to rebuttal. Thank you. Thank you very much. Good morning, and may it please the Court. Katie O'Sullivan for the Epelese. We submitted separate briefs, but I'm here today to argue the common issues on behalf of both United Talent Agency and my client, International Creative Management Partners, and Mr. Marenberg would like two minutes to cover issues relating to his client, UTA. The district court properly dismissed the plaintiff's first, second, and third amended complaints and was well within its discretion in ruling that after four tries, the plaintiff should not be given leave to file a fifth version of its complaint. The third amended complaint failed at the most fundamental levels. It failed to sufficiently plead a conspiracy or any antitrust injury flowing from that conspiracy, and its state law claims were equally deficient. To respond to some of Appellate's points, first the argument is, well, you need to consider these allegations in their totality, and the district court did so. The district court understood that there was kind of one sprawling conspiracy spanning nearly 20 years with disparate elements over that period, and zero plus zero plus zero is still zero. It was simply not plausible whether in its component parts or viewed as a whole. And secondly, a major part of the conspiracy argued on appeal, the 3310 was not pleaded in the third amended complaint. That's what I'm having trouble with. I mean, first of all, it is true that the order does say that there was an allegation and just says it was inadequate. Well, what the order has, and thank you, Judge Berzon, I wanted to address that there's one paragraph in the order dismissing the third amended complaint. It cites three paragraphs and says the plaintiff adds no factual details to support this conclusion. That's different than saying they didn't argue it. I mean, you can support, you can argue that she was right, that it was inadequately done, but not that it wasn't there. Here's what wasn't there. What wasn't there is that there was a fixed and uniform agreement that all the large talent agencies had to impose the same 3310. Isn't that what price fixing means? Well, what the complaint actually said in paragraph 73 was that the system encouraged price fixing, which is, of course, a far cry from actually alleging price fixing. But if you look at paragraph 53 of the third amended complaint, that's where there's actually a reference to the words packaging fee. That paragraph says nothing about there being an agreement to set that fee, that it was uniform among all of the large talent agencies, and that there was no deviation. That is simply an argument that they have alleged in theory in their appeal briefs, but it has not been pleaded. I'd like to then go to the 16G. Has that been pledged? Would that state a cause of action in your mind? No. It would simply not be sufficient. Even, let's say, this belated conversation comes in that there was some kind of agreement, and it's simply too little, too late. The allegation about an agreement that came from a conversation with Mr. Haskell was from a different time period, apparently 1995 to 1996, whereas this 16G conspiracy supposedly started in 1999. So you have a different time period. You have a different subject matter. 16G is not connected. I think you understood it correctly the first time, Judge Berzman. The dots are not connected. I did understand it correctly the first time. And so it's simply too little, too late. What about this 2014 press conference or whatever? I don't understand what its implication is, but that was the other thing you brought up. Yes, and I did want to respond to that. This was an interview with The Hollywood Reporter, and the full transcript of that interview is available in the supplemental excerpts of record. If you look at pages SER 134 to 135, you can see that statement was in response to the following question. Do you care that you don't know how many people are watching on Netflix and Amazon? In other words, we have these new streaming platforms that didn't even exist when the supposed conspiracy began. How are you going to value or quantify that? Well, we'll have to figure that out. The district court mentioned that in a footnote. It was unnecessary to the outcome of the decision. And it's simply not dispositive here. I was about to turn to 16G. In other words, wasn't it the Screen Actors Guild that killed this? And the answer is yes, and that is pleaded in the third amended complaint. If you look at paragraph 37 of the third amended complaint, it says, quote, the dysfunctional leadership of SAG is what was the cause of the demise of that rule. So it was not some kind of a conspiracy by the large talent agencies that ended that. According to the plaintiffs, it was a little bit of a win-win for them. You're either going to force SAG to negotiate what you wanted, or the rule was going to die. So it seemed like either way they were going to be in a position to start taking a percentage from the studios. But in terms of a conspiracy, it seems an awfully far-fetched and attenuated conspiracy that we're going to propose something reasonable and negotiate with the Screen Actors Guild board. They're going to agree with us, but then somehow that the rank and file are going to reject it. This goes back to the question at the beginning. Did 16G, the reason they could take a percentage from the studios, I thought 16G had to do with equity investments. Right. And 16G, this really goes to your point, Judge Bybee, about it being a rational business model. It's just as consistent with rational economic interest in having access to capital. Was 16G ever read as precluding a payment by the studios to the talent agencies for a particular product as a percentage of profits? Was that an understanding or not an understanding? I think it was not an understanding. Wasn't the allegation, as I understood it, that the elimination of 16G enabled the cash infusion, which in turn enabled this different form of compensation? Right. That's certainly the allegation. But in terms of the who, what, when, where, the only time they actually get some people in the room together is in a trade association meeting. And if every trade association meeting – But at some point you can have a constructive allegation of an agreement, right? There has to be an agreement. But even after Trombley and so on, you don't necessarily need people in a room in a complaint, do you? Well, this Court said in Kendall that you do need the who, what, when, where, who did what to whom when, and whether the people are in a room or they're exchanging it by e-mail, you may not need them literally in the room, but you do need – But that seems entirely unrealistic that somebody – I mean, if, for example – and the texting case that she talked about before seems somewhat to the contrary. I mean, there is some point at which you can say that there is no way this could have happened without an agreement, without saying who, what, when, where. No? No way? Well, first of all, that is the law of the circuit, Kendall, requiring that. But secondly, they have nothing else beyond that. These other – the supposed interest in excluding the smaller talent agencies from package deals, there's no there there. The district court said very patiently in ruling on the first and – excuse me, yeah, the first and second amended complaints, you haven't had sufficient detail here. In other words, come up with something. And they come up a list with all these packages, but not one where a small talent agency asked to be included and wasn't given the opportunity, let alone something that Lenhoff, the plaintiff, asked for and wasn't included. And then these allegations – To go back to Kendall, what Kendall actually says is a specific time, place, or person. I mean, they had persons. Right. The one place where they added to the third amended complaint of people. But it doesn't say what you said it said, at least so far I can't find it. I'm sorry, Your Honor. But the one instance where they have any of that is for 16G, which was killed by the Screen Actors Guild. And then it's totally disconnected to these other allegations where there are really no additional details at all, let alone coercion. Coercion is pleaded, if you look at paragraph 76, of veiled threats against the studio. Well, a veiled threat by definition is one we don't know who was making it or to whom. And my favorite, since I'm ICM's lawyer, is when ICM supposedly cajoled ABC. That's paragraph 42. Obviously, there's nothing unlawful about cajoling, trying to lawfully persuade a network to take one of your shows. So the district court ruled on the Sherman Act claim really on two grounds, one of which was there's simply no conspiracy here, no agreement. And secondly, on no injury. And the most straightforward path to evaluating antitrust injury is the one the district court reached, which is they hadn't pleaded the predicate agreement. But it would be equally straightforward to conclude that there was no injury allegedly suffered by this plaintiff from the supposed conspiracy. Let's go back to the who, what, when, and where question. Let me just be upfront about what's troubling me. Whether or not they sufficiently pled the horizontal price fixing is a separate question. But it frankly seems to me to be their strongest argument of adequately pled. And the Starr v. Baca case, which was three years after Kendall, seems quite clear about the fact that you can't have circumstantial evidence to prove an agreement, right? Of course you can have circumstantial evidence. But you said no. You said you wanted to know who, where, when, and how. And that's not – I mean, how can you have circumstantial evidence of that? I found what I believe is the quote from Kendall, which is – Well, I understand that. And this was three years later. And it said that if you plead a set of facts from which it is plausible within the meaning of Trombley and Iqbal that there must have been a conspiracy because this wouldn't have happened without a conspiracy, that is enough. Does it not say that? Yes, in Starr v. Baca. And the principle from that case is that where there are two equally plausible theories. Yes, but I'm going to something else, which is that it can be inferences from what happened, and you don't need to know who was in the room, where, when, or how. Is that right? Fair enough. So you were quite misleading in saying otherwise. Go ahead. I am sorry, Your Honor. This Court has not disavowed the ruling in Kendall, which says that the complaint there does not answer the basic questions who did what to whom or with whom, where, and when. But there are circumstances under which we would say, okay, it's clear that somebody got together and conspired to do this because the result of this is just so utterly implausible. Let's suppose that the Uber agencies, that each one of them demanded a – that all of a sudden the studios saw the same provision coming up in every contract that said all funds are to be paid into account number, a long account number in the Bahamas, and everybody had the same account number. We would go, okay, not sure who got together when, but it's pretty clear somebody's been talking. Absolutely, Your Honor, and like the Court said in Twombly, if you had a historically unprecedented change all at the same time, numerous companies all doing the same thing for no discernible reason, then, of course, you're much more likely to infer that the theory was plausible. So the argument here would be something along the lines – and I understand you say that it wasn't raised, and maybe it wasn't – but it would be something along the lines of there was a complete change, and it was a change to a specific set of numbers, not just the general notion that you're going to have a scheme of upfront and back compensation from the studios, but specific numbers. Those specific numbers never changed and have never been undercut by any of these four people, and why wouldn't somebody start fooling around with the numbers if they were trying to get a better deal? And so they must have agreed. Right, and that's not what they alleged here. What they alleged at the last minute that they didn't actually file an amended notice of appeal from related to a conversation that one of the talent agencies, not a name dependent, actually lowered its packaging price in response to pressure from the studio. And so it's entirely the opposite of the scenario where they all act in concert to do – That was earlier, way earlier, right? That allegedly happened in 1995, 1996. Right, but since then nobody's done it. No, the – All right, so that's why I was trying to put aside your waiver point. Suppose those allegations were in the complaint the way I just recited them. Suppose they were. They were fixed and uniform and no one varied from it, which is, of course, not what they've alleged here. Okay. And it was a huge change from what was there before. Well, again, putting aside that none of that has been alleged, it can be a perfectly lawful practice, industry practice, to charge the same base fee. But, see, what's odd about this is it's not just everybody charges $1.99. It's that it's a very specific scheme with specific numbers at different stages, and it's not very firm. Well, none of that, none of that was alleged. They admit that. They actually acknowledge in their opening brief that plaintiffs did not plead the 1990s price-fixing agreement. So to get up here and say that this is somehow what they have pleaded is just simply not consistent with the 30 minutes. You still haven't answered my question. What if they had? I think it would be a different case is the answer, Your Honor. It would be an entirely different case. The district court was extremely patient here, gave the plaintiff four chances. They were deficient at every stage, and the notice of appeal was the final deficiency. There's not a case where they asked for limited discovery to do anything more to support their complaint until it had been dismissed three times. The district court was well within its discretion in ruling that they should not get a fifth shot. Thank you very much. Thank you. Your Honor, if you don't have any questions particular to UTA, I will just sit down and cede my time. Do you have anything you're dying to add? Do you have anything you're dying to add? No, Your Honor. Okay, thank you. All right. Anybody? No, thank you. Okay, thanks. Thank you, Your Honors. Let me first take up an issue that I think is important and then the Court has touched on it. In the complaint, at paragraph 53, it is alleged that UTA and ICM are charging 3,310 across the board. In paragraph 78 of the complaint. You don't really say that they invariate and so on, do you? We say the packaging Uber agency receives a guaranteed fee of 3 percent of the budget, which is often already more than the talent receives, in addition to 3 percent deferred and 10 percent gross profit participation before the talent's net profit participation. And in paragraph 78, it is alleged that as follows. On page 24, in lines 1 or 2, that I'm sorry, starting at paragraph 70 at the beginning of paragraph 78, defendant's conduct has caused injury in at least two respects. And then it goes on to say that they allocate the market amongst themselves but limited to co-packaging agreements that are exclusive and they set the price or the packaging fee paid by the studios. So there are allegations that were in there and the District Court recognized that. In the Kendall case, as well as in the musical instruments case, there was a very significant distinction to be made in those cases. Both of those cases came up to this court after having had an opportunity for discovery to occur. And so in those cases, there was a record, as the court recognized in the earlier case that we heard today involving San Ysidro and Calexico, it is important to be able to have a record that you can go to. So what weight should we give to the fact that you didn't seek to have an opportunity for discovery prior to the court entering the final judgment? I don't know that there is much to be stated other than to say that that did not occur. Whether it would have or would have not, I don't know. But it is fair to say that the request was not made. In addition, the argument is being made that the 3310 is a business decision. It is not, and it makes no colorable sense. As Judge Berzon mentioned, this is not a case involving a product that is standard in the industry. It's not a widget that one competitor can make and another competitor can make. We're talking about package-scripted television series. And it belies belief, at least to me, that where you have a situation where talent agencies are able to say, I have a package-scripted television series, and let's just take as for example, I've got a series that involves a newspaper, and I will bring to you Tom Hanks, and I will bring to you Meryl Streep, and I will present this to you. It defies belief that they would accept 3310 for that series when they're accepting 3310 for a series by a young artist, not developed, and not a program that has no basis in reality, as my hypothetical of The Washington Post would be. So what makes this interesting and what I think the Court, I believe, the facts do demonstrate, is that this is a case where you don't necessarily need to always say, here's the who, here's the what, and here's the why. And I think, Judge Bybee, you recognize that also. There has to be the case out there. There are two. Text messaging, there was no indication. That's not from the Ninth Circuit, but it is from the Seventh Circuit. The Sony versus MGA, I believe, is a case out of the Second Circuit where there was no who, what, when, or why that was necessarily specifically pled. So what you have in antitrust cases is a very difficult situation right now that has developed on the plausibility front. I think the facts that we have alleged, not the least of which is the existence of this agreed-upon pricing for these package series, the limitations in the numbers of times that the defendants will co-package with small talent agencies, the demise of many talent agencies during this period from 2001, 2002, to 2014, where there's been a drop of approximately 71 percent in small talent agencies. And you have – there are comments in here. There are comments from talent who are frustrated by this system, who can't seem to get their studio to break it, which demonstrates, if anything, a stranglehold that the agencies, these four agencies, have over these studios as a result of the volume of these package deals. There is testimony in this complaint from – and it's not testimony, but it's a statement in a record – by Gavin Pallone. A talent agency was paid money for doing nothing because of this, what we say, is an agreement in its entirety to try to monopolize this market, to create one group, the four, who are all you can do and are the only ones that anyone can go to. And with that, I know the time is drawn nigh, and the Court has been very indulgent, and lunch is 20 minutes past. Both have been incredibly helpful in a difficult case, so thank you very much.
judges: Berzon, Bybee, Gleason